2025 IL App (1st) 240835

SECOND DIVISION
June 24, 2025

No. 1-24-0835

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| | ) | Circuit Court |
| PAMELA HARNACK, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 08D2844 |
| and | ) | |
| | ) | |
| STEVE FANADY, | ) | Honorable |
| | ) | Michael Forti, |
| Respondent-Appellant. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court.
Presiding Justice Van Tine and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's order denying a contemnor's motion to vacate his incarceration for indirect civil contempt affirmed where the contemnor failed to show that his incarceration was no longer coercive.

¶ 2    Appellant, Steve Fanady, is currently committed to the Cook County Jail pursuant to a civil contempt order after he has, for more than 13 years, consistently refused to turn over shares of stock, valued in excess of $10 million, that were awarded to his ex-wife, Pamela Harnack, under their judgment for dissolution of marriage. During the extensive history of this case, this court has

repeatedly outlined various actions taken by Fanady to conceal the parties' marital estate and avoid his obligations to Harnack under the judgment, including by transferring the shares to and between international accounts, which he did with the express goal of making himself "uncollectable." In the most recent prior appeal, this court affirmed the trial court's decision to hold Fanady in indirect civil contempt and commit him to the Cook County jail until he purged that contempt by complying with the order to turn over those assets, or their monetary value, to Harnack. In particular, we found that Fanady had not met his burden to show that it was impossible to comply with the order, and that the trial court did not err in rejecting his claim that he did not have the financial means to comply with the order when he provided no "definite and explicit evidence" to support that claim. Following that appeal, Fanady was taken into custody, and he moved to vacate the contempt order one month later, continuing to maintain that it is impossible for him to comply. After an evidentiary hearing, the trial court denied Fanady's motion. Fanady now appeals.

¶ 3    The extensive proceedings in this case have been discussed at length in other appeals, in particular, *In re Marriage of Harnack*, 2014 IL App (1st) 121424 (*Harnack I*); *In re Marriage of Harnack*, 2019 IL App (1st) 170813-U (*Harnack II*); *In re Marriage of Harnack*, 2021 IL App (1st) 210014-U (*Harnack III*); *In re Marriage of Harnack*, 2022 IL App (1st) 210143 (*Harnack IV*). We will repeat the facts of those cases insofar as they are relevant to the instant appeal.

¶ 4    The record shows that Harnack and Fanady were married in October 2003, and Harnack initiated a dissolution action against Fanady in March 2008. Fanady stopped appearing in the action, and a default judgment was entered against him. Pursuant to the dissolution judgment, the trial court found that Fanady was worth approximately $7.3 million as of March 2010, while Harnack had minimal income, had health issues, and was unable to support herself. The circuit court further found that the marital estate included 280,000 shares of Chicago Board Options Exchange, Inc. (CBOE) stock, which were 100% owned by Fanady. The court noted that one of Fanady's business partners

had instituted a breach of partnership action, which was pending with 40,000 shares in dispute, and the court ordered 40,000 shares to be held in an escrow account pending resolution of that action. The court awarded Harnack 120,000 shares of the CBOE stock, and "[t]he balance" of the shares was awarded to Fanady.

¶ 5     As described more specifically in prior appeals, it became clear that Fanady was avoiding obligations, not only to his ex-wife, but to his business partners as well. The dissolution matter was consolidated with a breach of partnership action, as well as an interpleader complaint filed by the CBOE stock holding company against all parties claiming an interest in the stock.

¶ 6     Fanady subsequently attempted to vacate the judgment for dissolution of marriage, arguing that the judgment was unfair and based on a misunderstanding of the size of the marital estate. The trial court denied Fanady's motion in May 2012. This court affirmed the denial of Fanady's motion to vacate, noting that the record showed his

> "complete refusal to participate in the dissolution proceedings for more than 15 months, his attempts to evade service of process and his refusal to comply with the court's orders regarding payment of maintenance and with its restraining orders and injunctions barring him from [the] transfer of any assets held by him or his enterprises." *Harnack I*, 2014 IL App (1st) 121424, ¶ 46.

¶ 7     We also noted that the record showed Fanady's "attempts to evade the jurisdiction of the court and to defraud this court," as well as a Florida court, where he obtained a dissolution of marriage judgment under false pretenses. *Id.* The record further showed that Fanady "forge[d] *** a dissolution judgment in order to obtain a religious divorce" and attempted to "hide marital assets by selling one presumptively marital CBOE seat and hiding the money received in Switzerland and by transferring 120,000 presumptively marital shares" from partnership accounts. *Id.* In light of the above, we explained that "Fanady was the architect of his own predicament" and that

3

"any alleged errors in the judgment or inequalities in the distribution of assets are solely due to Fanady's failure to participate in the dissolution proceedings. Any errors or injustices in the judgment for dissolution of marriage of which Fanady now complains would not have occurred absent his abandonment of the litigation. Fanady chose not to participate in the litigation. He must now live with the consequences of that decision." *Id.* ¶¶ 46-47.

¶ 8 We further explained:

"Rather than participate in the action and present his own evidence to the court to rebut Harnack's evidence, Fanady chose instead to make underhanded efforts to prevent Harnack from getting her appropriate share of the marital assets and to avoid the trial court's jurisdiction. His behavior in this case has been so egregious, so contemptuous of the law and the court, that he cannot now complain that substantial justice requires that the judgment for dissolution of marriage be set aside." *Id.* ¶ 62.

¶ 9 Over the next several years, Harnack attempted to obtain the shares she was awarded in the judgment. As Fanady had already concealed many of the CBOE shares that were part of the marital estate, the only shares that appeared to be remaining for distribution were in the holdings account that was the subject of the interpleader action. The trial court denied Harnack's request to distribute her portion of the shares from that account, concluding that the breach of partnership action and the interpleader action had "to get resolved before any release of any of these shares is ordered" and that the release of the shares to Harnack would be "detrimental to" Fanady's business partners, who also had claims to those shares.

¶ 10 Following extensive briefing and a three-day trial regarding the proper distribution of the CBOE shares, the trial court entered an order on July 11, 2017. The trial court faulted Fanady for his attempts "to deceive his ex-wife and his former business partners," explicitly noting that Fanady had

"transferred an additional 120,000 shares of stock to locations which he now refuses to disclose." Because Fanady had already received and transferred the shares to which he was entitled from the partnerships, the trial court concluded that the remaining shares belonged to Fanady's business partners. Fanady—and by extension, Harnack—had no claim to the remaining 120,000 shares that were being held by the stock holding company. The trial court found Harnack's arguments "compelling as an equitable matter," but concluded that she was required "to chase Mr. Fanady for her just share of the marital estate." On appeal, this court dismissed certain issues for lack of this court's jurisdiction and otherwise affirmed the judgment of the circuit court as to Harnack's claims against Fanady's business partners. *Harnack II*, 2019 IL App (1st) 170813-U, ¶ 98.

¶ 11   The case then continued in the circuit court. On December 9, 2019, Harnack filed a petition to enforce the judgment for dissolution of marriage. Harnack explained that the judgment, which had been affirmed by this court, required Fanady to transfer 120,000 shares of CBOE stock to Harnack. Harnack stated that Fanady had "delayed the enforcement of the [judgment for dissolution of marriage] by filing frivolous and fraudulent legal actions against" her and requested that the trial court "end [Fanady]'s delay tactics and enforce" the judgment. Harnack further requested, "in the event [Fanady] is no longer possessed of said shares," that he be required to "pay [Harnack] the value of said shares in an appropriate amount along with any interest, dividends, or other monetary benefits collected by [Fanady] while he was in possession of said stock."

¶ 12   On April 27, 2020, Fanady filed a motion to dismiss Harnack's petition for enforcement. Fanady argued that it was "impossible to award" Harnack the relief she sought because the shares she was awarded in the judgment "no longer exist[ ]" and because those shares were determined to "belong[ ] to others." Fanady further argued that the "law of the case" doctrine and "collateral estoppel" barred Harnack from "relitigating" the ownership of the CBOE stock that was awarded to Fanady's business partners. Fanady additionally maintained that the court could not grant

Harnack's alternative request that he pay her the value of the CBOE shares if those shares were no longer available because doing so would be "improperly engrafting an additional obligation into" the judgment.

¶ 13 Harnack responded to Fanady's motion to dismiss on May 20, 2020. Harnack argued that Fanady failed to assert any proper basis for dismissal. Harnack pointed out that the interpleader action was a separate action, which did not extinguish or otherwise adjudicate Fanady's obligations to Harnack under the prior dissolution judgment. Instead, the issue in the interpleader action "was who had a legal right to certain specific shares that were being held by the interpleader in that cause," and that action did not bar Harnack's claims. Instead, Harnack had "a right to enforce" Fanady's obligations under the judgment, and it was Fanady who could not "continue to litigate the legitimacy of those claims." Harnack further asserted that the judgment awarded her 120,000 shares of CBOE stock and provided a way for Harnack to receive what she was awarded, but the provisions were "separate and the former does not depend on the latter." Harnack claimed that she was "not seeking to modify the dissolution judgment, only enforce it," which the court had "indefinite jurisdiction" to do.

¶ 14 On June 19, 2020, the court held a hearing on Fanady's motion to dismiss. After hearing argument from both parties regarding the judgment, the court concluded that the dissolution judgment did not delineate "specific shares that are awarded to Ms. Harnack versus Mr. Fanady" but rather set out the parties' marital estate and ordered "120,000 of those shares *** to be transferred to Ms. Harnack." The court entered an order denying Fanady's motion to dismiss, as well as his subsequent motion to reconsider that order.

¶ 15 On July 17, 2020, Fanady answered Harnack's petition for enforcement, in which he largely repeated the arguments contained in his motion to dismiss. Fanady further alleged several affirmative defenses, including *res judicata* and unclean hands.

¶ 16    On November 11, 2020, Fanady filed a motion for summary judgment, in which he argued that Harnack was not entitled to the relief she sought because she "knowingly deceiv[ed] the trial court as to the size of the marital estate," and because awarding her the shares of CBOE stock would "violate the established law as stated in the doctrine of *** unclean hands."

¶ 17    On November 30, 2020, Harnack responded to Fanady's motion for summary judgment, contending that the motion was virtually identical to his motion to vacate the judgment, which was denied years prior, and the denial was affirmed on appeal in *Harnack I*. Harnack argued that Fanady's arguments "that the Judgment cannot be enforced because it is not fair are *res judicata* barred ***. An enforceable Judgment is the law of the case and [Fanady] cannot continue to relitigate this theory."

¶ 18    On December 10, 2020, the court held a hearing on Fanady's motion for summary judgment and Harnack's petition to enforce. The court denied Fanady's summary judgment motion, specifically finding that it had "no basis in law or fact." Proceeding to Harnack's petition to enforce, Harnack testified briefly to confirm that she had never received the CBOE stock that she was awarded in the judgment. Fanady also testified. The bulk of Fanady's direct testimony included reading at length from court documents.

¶ 19    After hearing argument from the parties, the court granted Harnack's petition to enforce and ordered Fanady to transfer to Harnack 120,000 shares of CBOE Holdings, or the equivalent thereof, by December 18, 2020. The court entered a written order the next day, December 11, 2020, memorializing the above and specifically ordering Fanady to transfer to Harnack "120,000 shares of CBOE Holdings and any other monetary benefits accruing to said shares including but not limited to interest and dividends from the date of the divorce judgment" or, if he no longer possessed those shares, to "pay [Harnack] the value of said shares along with any interest, dividends, or other monetary benefits collected by [Fanady]" on or before December 18, 2020.

¶ 20    On appeal in *Harnack III*, 2021 IL App (1st) 210014-U, Fanady argued that the trial court erred in denying his motions for summary judgment and to dismiss and in ordering him to turn over 120,000 CBOE shares, or the value thereof, to Harnack. Fanady claimed that Harnack was not entitled to the shares that she was awarded in the dissolution judgment because it had subsequently been determined that those shares belonged to Fanady's business partners. We affirmed the trial court's judgment, explaining that the dissolution judgment awarded Harnack 120,000 shares of CBOE stock, not only certain shares identified by stock numbers or otherwise, and that Fanady could not "escape his obligations to Harnack by swindling his business partners, ensuring that the assets awarded to Harnack under the judgment are unavailable." *Id.*, ¶ 45. We also explained that Fanady's "attempts to relitigate the judgment, and his continued arguments that it was unfair or based on an overstated marital estate, are not persuasive. Those arguments were considered and rejected more than seven years ago, in *Harnack I*." *Id.,* ¶ 49.

¶ 21    Meanwhile, Fanady failed to comply with the December 11, 2020, order by the December 18, 2020, deadline. On December 30, Harnack filed a petition for a rule to show cause for Fanady's failure to do so. On January 25, 2021, Fanady filed a response to Harnack's petition for rule to show cause. In his response, Fanady referred to a trust, which had been a continuing point of contention between the parties throughout these proceedings. That trust was wholly owned by Fanady and was established in Belize. The parties disputed when the trust was established, with Fanady contending that it was created prior to the parties' marriage and Harnack alleging that it was created after. Throughout these proceedings, Fanady acknowledged that the trust contained "everything he has ever owned," but resisted Harnack's attempts to ascertain what assets were in that trust and claimed that it was impossible for him to obtain any assets from the trust. Fanady asserted that it was "a blind trust, and Fanady ha[d] no way of finding out what the trust holds, or earns." Fanady further described the trust as a "spendthrift trust," which paid Fanady "what he requires for

his ordinary living expenses, other reasonable expenses required to defend himself and the trust in court, and no more."

¶ 22    In his response to Harnack's petition for rule to show cause, Fanady argued that it was impossible for him to comply with the court's order. He alleged that he provided a copy of the court's order to the trustee of the trust, and the trustee denied having ever held shares of CBOE stock. He indicated that the trustee would not comply. Fanady asserted that he did not have any shares of CBOE stock in his possession, and that he could not comply with the order.

¶ 23    In his response, Fanady attached a letter purporting to be from the trustees. The letter stated that the trustees were "in receipt of your request letter and a copy of the above referenced court order related to the transfer of 120,000 shares of CBOE Holdings as ordered by the Illinois State Court." They stated that they did "not have records to show that the *** Trust has ever owned any such shares." They further stated that pursuant to "the terms of the *** Trust and Order of The Court of Belize issued in 2018 *** we cannot comply with any request whatsoever as this request have [*sic*] been made by you under duress." The letter further indicated that the trustees were "not obligated to nor will they satisfy your request at this time." Also attached was an order purporting to be from the Supreme Court of Belize, ordering that the trustee "shall not be obliged to act in response to, in furtherance of, or in compliance with any order or process of a foreign court," unless the order was "issued, sealed or otherwise liable to be enforced pursuant to or in accordance with the Laws of Belize."

¶ 24    At the February 9, 2021, hearing, Fanady testified that the December 11, 2020, order required him to turn over shares of stock in "CBOE Holdings" but that "the company known as CBOE Holdings, Inc. ceased to exist on October 17, 2017." Accordingly, Fanady asserted that those shares were "no longer available t[o] be transferred, purchased, sold, or traded," and it was therefore "impossible" for him to comply with the order. Fanady further contended that, since CBOE Holdings

ceased to exist, the "value of CBOE stock on December 11, 2020[,] was zero dollars." Fanady further testified that he "h[ad] tried to get shares from the trust," but there were "no shares available."

¶ 25   Harnack's counsel argued that Fanady talked about "an offshore trust somewhere," but had not "presented *** any sort of documentary evidence to match up with" Fanady's representations, including "a copy of the trust." Counsel stated that it was not Harnack's

> "burden to demonstrate what Mr. Fanady did with the shares *** [or] the millions of dollars he wrongfully removed from this jurisdiction. It is Mr. Fanady who is coming before this Court and telling you that he cannot comply with an order of this Court based on *** the impossibility of his compliance."

¶ 26   Counsel asked the trial court to "note that CBOE is publicly traded *** on the NASDAQ stock exchange," and as of December 11, 2020, "the close price of the share was $85.97." The 120,000 shares at $85.97 per share calculated to approximately $10.3 million, and counsel for Harnack requested that Fanady be ordered to pay at least $10 million. Counsel argued that Fanady was seeking to "seize on [a] name change, a public name change that had nothing to do with *** the corporate structure. It is still the exact *** same stock that is referenced in the underlying 2011 judgment."

¶ 27   Counsel asked the court to enter a body attachment order, stating that Fanady had

> "demonstrated that there is nothing short of arrest that will enforce the orders of this court. *** You cannot stay enforcement any further because all it does is delay because Mr. Fanady will not comply whenever he is told to do it. The only [thing] that is going to get him to comply is the contempt powers of this Court and the arrest functions of the Sheriff.
>
> I ask Your Honor please to enforce what has been going on since 2011; that Mr. Fanady continues to flaunt to this day. Find him in indirect civil contempt of court,

10

issue the body attachment, do not stay this, Judge, because Mr. Fanady amongst other things is a dual passport citizen and has alternative means that he has been previously been notified [*sic*]. This cannot wait any further and any further delay just risks further non-compliance as has been demonstrated time and time and time and time again."

¶ 28    In ruling, the court explained that it had been "almost ten years" that Harnack had been "simply tr[ying] to enforce the judgment [and] *** get her share of the marital estate based on the judgment that was entered in August of 2011. *** I find Mr. Fanady's failure to comply with the judgment from 2011, and then subsequently and more recently his failure to comply with my order of December 11, 2020, to be willful and contumacious. He is held in contempt of court and remanded to the custody of the Sheriff of Cook County."

¶ 29    The court entered a written order of adjudication of indirect civil contempt, finding that Fanady had failed to comply with the December 11, 2020, order, that he had not given any legally sufficient reasons for his failure to comply, that he had the means to comply with the order, and that his failure to comply was willful and contumacious. The court found Fanady in indirect civil contempt, and ordered him committed to the Cook County jail until he purged his contempt by transferring 120,000 shares of CBOE stock, or $10 million, to Harnack. The trial court explained that $10 million was "based on a reduced figure from the $85.97/share close price on December 11, 2020."

¶ 30    The court entered a body attachment order the next day, on February 10, 2021. In that order, the court found that Fanady had failed to comply with the terms of the December 11, 2020, order. The court ordered the sheriff to seize Fanady, and, if taken into custody, Fanady may be released after depositing 120,000 shares of CBOE stock, or $10 million, into escrow with the sheriff or the court. That order was subsequently corrected to reflect only the monetary amount, after counsel for Harnack explained that the sheriff's office would not execute the body attachment order because it could not

accept receipt of CBOE shares, but that Fanady could still appear before the court with the CBOE shares to resolve his contempt.

¶ 31    On appeal in *Harnack IV*, Fanady argued that the circuit court abused its discretion in finding him in contempt, committing him to the Cook County jail, and issuing the body attachment orders. *Harnack IV*, 2022 IL App (1st) 210143, ¶ 40. Fanady contended that it was impossible for him to comply with the December 11, 2020, order, because the order required him to transfer CBOE Holdings shares, but Fanady asserted that the company "no longer existed." This court explained, however, that even if we credited Fanady's contention that CBOE Holdings did not exist at the time of the order, such a conclusion would not excuse Fanady's failure to comply with the court order when it provided an alternative method to fulfil his obligation to Harnack—paying Harnack the value of those shares. *Id.*, ¶ 50.

¶ 32    We also rejected Fanady's argument that it was impossible for him to pay $10 million to Harnack because he "did not have" $10 million to transfer to her. We noted that Fanady never claimed that " 'poverty, insolvency, or other misfortune' prevent[ed] him from complying with the order," but that Fanady's position was that he

> "simply transferred assets that he possessed to an account—namely, the trust in Belize—which he believes makes those assets 'uncollectable.' He acknowledges that 'proceeds from the liquidation of the CBOE stock were transferred to' the trust, but he claims that 'the amount held by' the trust 'is not known by Fanady, and cannot be revealed to Fanady, pursuant to the terms of the trust.' Fanady also asserts that his 'access to any such money, is very limited under the terms of the spendthrift trust,' and all he 'can get out of the *** trust is enough to support a modest lifestyle.'
>
> Fanady has never explicitly denied that the trust contains in excess of $10 million. Tellingly, in his reply brief, Fanady compares his use of the trust to 'winners

12

of large lottery jackpots [who] take non-transferrable lifetime annuities rather than a lump sum *** so they can guarantee themselves a regular and safe lifetime income, rather than a large lump sum that is vulnerable.' Fanady asserts that through his use of the trust, he has 'made himself uncollectable,' but 'in doing so he has given up a great deal of control over any money or property he had.' " *Id.*, ¶¶ 53-54.

¶ 33    This court explained that, to show a valid defense based on inability to pay, " 'a defendant must show that he neither has money now with which he can pay, nor has disposed wrongfully of money or assets with which he might have paid' " (*id.* ¶ 52, quoting *In re Marriage of Logston*, 103 Ill. 2d 266, 285 (1984)), and Fanady could not "avoid his obligations to his former spouse by structuring his assets in an offshore trust with the express goal of 'mak[ing] himself uncollectable.' " *Id.* ¶¶ 52, 55.

¶ 34    This court also found that the trial court was not required to credit Fanady's testimony that he did not have either the CBOE stock or the cash equivalent, particularly where he provided no "definite and explicit evidence" to support his claim. We stated that it

> "was Fanady's burden to provide such evidence, and we do not find that the trial court's conclusion that Fanady had the means to comply with the order, and that his failure to comply was willful and contumacious, was against the manifest weight of the evidence or an abuse of discretion." *Id.,* at ¶ 56.

¶ 35    To the contrary, "the record support[ed] the trial court's finding that Fanady failed to show he lacked the financial means to comply with the order. Fanady had no compelling justification for failing to transfer to Harnack her share of the marital estate, beyond his disinclination to do so." *Id.,* at ¶ 63.

¶ 36    This court also considered the appropriateness of the sentence imposed, explaining that "[i]ncarceration has long been an appropriate sanction for indirect civil contempt, so long as it serves

a coercive purpose." *Id.*, at ¶ 57, quoting *Sanders v. Shephard*, 163 Ill. 2d 534, 540 (1994); *Tirio v. Dalton*, 2019 IL App (2d) 181019, ¶ 73; *Logston*, 103 Ill. 2d at 289. This court found

> "no abuse of discretion in the court's determination that Fanady would ignore a more lenient sanction and that incarceration was appropriate and necessary to coerce Fanady's compliance. The contempt sanction ordered in this case was properly coercive; Fanady holds the 'keys to his cell' and may purge the contempt at any time, by simply complying with the order." *Harnack IV*, 2022 IL App (1st) 210143, ¶ 59.

¶ 37    Finally, we rejected Fanady's contentions that the body attachment order exceeded the $1000 amount authorized by statute in section 12-107.5 of the Code of Civil Procedure. This court explained that the section on which Fanady relied governed body attachment orders that are intended to bring an alleged contemnor before the court, so that the he or she may "answer for a charge of indirect civil contempt," and the section did not apply when a person "has already been given that opportunity, appeared before the court, and been held in contempt." *Id.* ¶ 72. Because the body attachment orders were not entered pursuant to that section, "any limitation on the monetary amount provided by that statute is similarly inapplicable." *Id.*

¶ 38    Meanwhile, while *Harnack IV* was on appeal, Fanady had been appearing at court dates in the trial court via Zoom, often refusing to appear on camera, seemingly to avoid giving any clues as to his whereabouts. The case was reassigned from the Honorable David Haracz to the Honorable Michael A. Forti.

¶ 39    On March 15, 2022, approximately a year after the trial court entered the body attachment and order committing Fanady to jail, Harnack filed a motion to extend the body attachment order, asserting that the order would arguably expire after one year. Because Fanady had not yet complied with the order and purged the contempt, nor had he been taken into custody, Harnack asked that the court enter an order extending the body attachment order.

¶ 40    On March 21, 2022, Fanady responded to Harnack's motion, asserting that the body attachment order had already expired, and that there was no authority to extend a body attachment order beyond a year. Fanady argued that Harnack was required to bring a new petition for rule to show cause, and have a hearing at which Fanady would "be allowed to state his defenses." To "save time and effort," Fanady asserted that he had

"consistently asserted for the last twelve (12) years, and shown documentary evidence that; (a) the CBOE stock in question was liquidated nine (9) months prior to the August 3, 2011 Judgment of Dissolution, and (b) since 1995 any funds he has, or ever had or received is held by an off-shore trust established in 1995 in the Country of Nevis, and that access to those funds can only be had through a request to the trustee."

¶ 41    On June 14, 2022, less than two weeks after our decision in *Harnack IV* was issued, the trial court held a hearing on Fanady's motion to extend the body attachment order. The court expressed its understanding that, pursuant to *Harnack IV*, the terms of expiration contained in section 107.5 did not apply to the body attachment order issued in the case, but nonetheless, "in an abundance of caution," the court issued a new body attachment order to ensure that the sheriff would effectuate it. Thereafter, on June 21, 2022, the trial court entered a written order granting Harnack's motion to extend the body attachment order, and by separate order, the court entered a new body attachment order. The trial court also ordered Fanady to personally appear at an in-person status hearing on August 24, 2022, and such "requirement shall not be satisfied by appearance through counsel." A new attorney was granted leave to file an appearance on behalf of Fanady, and Fanady was ordered to "disclose his present address, through counsel, on or before Thursday, June 23, 2022."

¶ 42    Also on June 21, 2022, Fanady filed documents purporting to be letters from the trustees of the trust, asserting that Fanady's request to "comply with the Illinois State Court order" could "not

be considered due to insufficient financial resources within the" trust. The letter also indicated that, "due to insufficient financial resources within" the trust, it was "dissolved and terminated on this day, April 17, 2022."

¶ 43    On June 27, 2022, Fanady's new counsel filed a motion to withdraw his appearance. Fanady's counsel asserted that he had been retained to address a discrete issue, which was no longer relevant in light of the trial court's June 21, 2022 order. Counsel also provided Fanady's "last known address."

¶ 44    The next day, on June 28, 2022, Fanady was taken into custody.

¶ 45    On July 21, 2022, the trial court held a status hearing. No transcript from that hearing appears in the record on appeal.

¶ 46    On July 28, 2022, one month after he was taken into custody, Fanady filed a "Motion to Purge or Vacate Contempt." Fanady asserted that it was "impossible for him to comply with the purge terms of the contempt order and obtain release from custody." Fanady stated that his motion was "supported by documents previously admitted into evidence during the" April 2017 hearing at issue in *Harnack II*. Fanady argued that it was impossible for him to comply with the order directing him to turn over 120,000 shares of CBOE stock or $10 million, because "the 120,000 shares of CBOE stock referred to in the August 3, 2011 Judgment of Dissolution were liquidated prior to the entry of the Judgment of Dissolution" and accordingly, there were "no shares of CBOE stock to turn over to Harnack." Fanady also asserted that he would show that he did "not have any money or assets" through the documents he had previously filed, which he claimed showed that the "overseas assets protection trust into which Fanady's money and assets, as well as the proceeds of the liquidation of the CBOE stock, were held has been closed by the trustee because all of the funds have been exhausted."

16

¶ 47    Fanady further claimed that the CBOE stock "was sold in the December 2010/February 2011 period" and calculated, using a January 2011 share price, that his trust "only got $2,900,000 in February 2011." Fanady asserted that the money had been spent since that time, and "[w]hile $2,900,000 may seem like a lot of money," it was "only $263,000 a year" over 11 years. Fanady further claimed that

> "other factors, such as trustee fees, fluctuating international currency rates, and losses from the trustee's investments, could have also contributed to the exhaustion of the funds in the SF trust. The bottom line is that the trust that held all of Fanady's assets has been closed because the money has been expended."

¶ 48    Fanady also submitted a "financial affidavit," which he asserted showed that "when not incarcerated, Fanady earns $3350.00 per month, has no assets, no stocks, no bonds, no real estate, no investments, no interests in any businesses, and no interests in any trusts."

¶ 49    Fanady concluded that it was "impossible" for him to comply with the judgment, and that accordingly, "the civil contempt order has lost its coercive effect and has become merely punitive, and should be vacated."

¶ 50    On August 1, 2022, Fanady filed an emergency motion to "set status on [Fanady]'s confinement for contempt as required by [Circuit Court of Cook County] Local Rule 13.8(a)([iv])." Fanady asserted that, pursuant to Local Rule 13.8(a)(iv), a contemnor who is in custody for indirect civil contempt must "be returned to the court for status at periodic intervals, but in no event less frequently than every thirty (30) days." Fanady asserted that he had been in custody for 34 days, and that no compliance status was set until August 24, 2022. Fanady acknowledged that he was " 'in court' by video" on July 21, 2022, but asserted that "no status on contempt compliance was held" on that date.

¶ 51    On August 10, 2022, Harnack responded to Fanady's motion, asserting that a status had already occurred within the first 30 days of his confinement at which the court had considered Fanady's purge and incarceration conditions. Harnack also noted that Fanady and his counsel appeared, that they did not object at any time to the nature of the hearing, and they did not object when the court struck another hearing date that had been scheduled for July 26, 2022. Harnack also pointed out that Fanady would be appearing before the court the following day, on August 11, and again on August 24. Harnack argued that the local court rule did not require Fanady to be allowed to "re-argue the merits" of the case every 30 days, and asserted that Fanady was "once again wasting judicial resources."

¶ 52    No transcript of the August 11, 2022, hearing date on Fanady's emergency motion appears in the record on appeal. The next day, on August 12, 2022, the trial court entered a written order noting that the parties appeared before the court on the previous day, and that the trial court heard argument on Fanady's emergency motion. The trial court found that Fanady's motion was not an emergency, and that there had been no violation of Local Court Rule 13.8(a)(iv). The court stated that the August 24, 2022, status date would stand, and that the status would "expressly include a purge status at which Respondent shall appear, via Zoom."

¶ 53    No transcript of the August 24, 2022, status date appears in the record on appeal.

¶ 54    On September 15, 2022, Harnack responded to Fanady's "Motion to Purge or Vacate Contempt." Harnack contended that Fanady was merely trying to "relitigate the merits of the underlying case," when his arguments had been previously considered and rejected. Harnack stated that Fanady's "arguments are literally cut-and-paste from his appellate brief" and that Fanady's "attempts to relitigate" were barred by the doctrines of *res judicata* and law of the case. Harnack further argued that the "*only* new assertion" (emphasis in original) in Fanady's motion was that Fanady's "alleged offshore trust has supposedly been closed." Harnack contended, however, that

Fanady "presented no accounting or documentary evidence" and that the "purported 'letter' from the 'trustee' is dubious, at best." Harnack contended that Fanady's "latest version of events is totally uncorroborated and contradicts his under-oath testimony for years," and accordingly, he had "not proven that it is impossible for him to comply with the Judgment."

¶ 55    Fanady filed a reply in support of his motion to purge or vacate the contempt order on September 22, 2022. Fanady alleged that *res judicata* did not apply because he is permitted to "continue to assert impossibility of performance," and because "each successive contempt hearing is a *de novo* proceeding," citing *Sanders v. Shephard*, 258 Ill. App. 3d 626, 632 (1994). Fanady also argued that the doctrine of law of the case did not apply because he was "bringing forth new evidence that did not exist prior to either the February 9, 2021, or the June 14, 2022 contempt orders. That evidence is that Fanady's trust has been closed for lack of funds."

¶ 56    The hearing on Fanady's motion to purge or vacate the contempt order occurred over two days, January 5, 2023, and April 18, 2023.

¶ 57    Fanady called Paul E. Greenwalt, III, a lawyer at ArentFox Schiff in Chicago, who represented CBOE Holdings, and CBOE's transfer agent, Computershare, during the interpleader action earlier in this case. Greenwalt testified regarding letters he wrote and documents he produced in discovery on behalf of his clients "in an effort to help the parties understand what had happened with the ownership of particular [CBOE] seats that Mr. Fanady was affiliated." Greenwalt testified that the documents showed the "transfer" of 120,000 shares from CBOE Holdings "out of an account that had been established for two entities controlled by Mr. Fanady," to NFS Financial, a broker-dealer. Greenwalt clarified that he "chose[ ] [his] language intentionally" and that the documents showed a "transfer of shares, not a sale." Greenwalt testified that he asked his clients if they were able to track where the stock was transferred after the initial transfer out of the account, and they

were "not able to track the stock any further." After the initial transfer, the stock "could have been transferred to another broker-dealer, it could have been sold. They would have no way of knowing."

¶ 58    Fanady testified that he was currently housed at the Cook County jail, where he had been for "[a]lmost ten months." Fanady generally claimed that he did not currently have any shares of CBOE stock, and that he previously had "an indirect interest in CBOE shares, 120,000 of them, up until February of 2011, early February." The parties stipulated that the CBOE stock price was $23 per share on January 1, 2011. Fanady stated that the "distribution of the sale of those shares" was held in his account at Pictet & Cie, a Swiss bank. Fanady denied that he ever had an interest in 240,000 shares and contended that Harnack caused the trial court to inflate the number of shares he possessed in entering the judgment. Counsel for Fanady asked him if the "math ma[d]e sense" in how the judgment for dissolution allocated the CBOE shares, and Fanady responded, "No."

¶ 59    Counsel for Harnack objected, citing "Relevance" and "Law of the case." The court asked Fanady's counsel, "what is the relevance? I'm letting you go into a little bit of background because I think it's informative to lay a foundation, but why is this relevant?"

¶ 60    Counsel for Fanady responded that

> "One of the bones of contention in the interpleader, it was something that Judge
> Haracz actually discussed, was that she misrepresented the number of shares that
> were in -- that Mr. Fanady had an interest in.
>
>     And I'm just trying to get at that, if you add up the number of shares that the
> partners were entitled to, plus the shares that Ms. Harnack was awarded in the
> Judgment of Dissolution and Mr. Fanady's shares, the math doesn't add up."

¶ 61    The court responded,

> "But, as I understand it, *** this proceeding is not attacking, in any way, the Default
> Judgment. *** We're on a different topic here, which has to do with the

20

appropriateness, or not, of Mr. Fanady's continued incarceration. Isn't that right? ***

We're not revisiting *** the default judgment that was entered by Judge Haracz. So

I think a little bit of background is useful, but let's assume that the evidence was --

again, this is just for sake of a hypothetical, if the evidence were overwhelming that

the math didn't work and Ms. Harnack got some undo benefit, I don't see how that

matters one iota in this case."

¶ 62    Counsel for Harnack agreed, stating:

"The question before the Court today is whether *** Mr. Fanady can prove to the

Court that it is impossible for him to comply with the twice-affirmed judgment.

We are not here to talk about the fairness of it, whether it should have been

entered, or in any way collaterally attack it, which the First District made clear, on

the first appeal, that they were not inviting subsequent collateral attacks. Then on the

second appeal *** [i]t said the same thing.

This is not a third opportunity for Mr. Fanady to collaterally attack the

judgment. The only question for the Court today is whether it is impossible by Mr.

Fanady's evidence for him to comply with the terms of the contempt order. That's

all we're here to do."

¶ 63    Counsel for Fanady responded that they were "not attacking the judgment. The judgment is

the judgment. But at the same time, it does go to the impossibility of performance." Counsel stated

that it was Fanady's position that this "fictional $10 million of stock that he supposedly has, the $10

million or 120,000 shares of CBOE stock, our argument is that that's a myth."

¶ 64    The court agreed that such evidence would be relevant, "[b]ut we're starting, as I understand

it, with 120,000 [shares]. And how we got there is less important than these other points that I trust

you're going to make through *** your client."

¶ 65    Fanady continued testifying, in particular regarding the financial affidavit he prepared in June 2022. Fanady testified that he was last employed in 2022, and he earned about $12,000 to $15,000 during that year. He stated that the trust did not currently pay any of his living expenses, and that it "stopped paying [his] living expenses in 2018." Fanady testified that the trust would "fund, from time to time, an LLC bank account by which funds could be *** used to pay for living expenses." Fanady also testified that he had spent "[a]bout one and a half million dollars" in attorney fees in the divorce involving Harnack, as well as another divorce from a subsequent wife. Fanady disputed Greenwalt's testimony, stating that "regulated exchange[s]" should "know each and every owner of share[s] in a regulated exchange." Counsel for Fanady asked him if he could "comply with the judgment to pay $10 million; or transfer 120,000 shares of CBOE stock *** to comply with the judgment," and Fanady answered, "No, not at all. It's an impossibility."

¶ 66    Counsel for Fanady concluded Fanady's direct examination. After some discussion, counsel for Harnack stated that he had "no questions for" Fanady, and that he would "reserve all cross-examination" for an "adverse direct examination pursuant to 1102 during our case should we so need."

¶ 67    Counsel for Fanady rested, and counsel for Harnack moved for a directed finding. Counsel for Harnack argued that Fanady had not "sustained his burden to demonstrate to this Court the impossibility of his compliance with the repeatedly affirmed court orders of the predecessor judges." Counsel explained that the

> "proceedings today are for Mr. Fanady to show you that something has happened since the First District affirmed the finding of contempt that it is impossible, or something to show that it's impossible other than 'Take my word for it.' But you didn't get anything. You didn't get a single piece of paper to corroborate what he said."

22

¶ 68    Counsel noted that Fanady did not submit "a single document that they didn't tell you had already been introduced into evidence, had already been considered by multiple courts and rejected multiple times." Although Fanady testified that he made a limited amount of money over the last few years, counsel pointed out that Fanady had not shown "a single bank statement." As for Fanady's testimony about the sale of stock, counsel noted that Fanady did not have any documentation regarding the sale, including a receipt or tax documents, and he did not even testify that it was sold on a specific date. He only asked the court to "take judicial notice of what the stock could be worth on a day, and let's approximate about how much I may have sold it for."

¶ 69    Counsel also stated that Fanady presented evidence of a trust, but he did not provide "[e]vidence of the corpus of the trust. You didn't see a single asset that is held in the trust that he talked about. You didn't see the depletion of assets."

¶ 70    Counsel further argued that Fanady's testimony was not believable, and

"even though you have to view the limited evidence that you saw in the light most favorable to Mr. Fanady, you don't have to check your common sense at the door.

What would you do if you were in jail for ten months? You'd produce every single document, every American Express account statement to show, 'This is when the trust stopped paying my expenses.' Every single bank account statement to show, 'This is when it was all done.' Every dissolution of every LLC to say, 'They're all dissolved. They're all gone. Everything is gone. I have nothing.' "

¶ 71    Counsel for Harnack responded that a directed verdict was warranted only "when there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." Counsel stated that "some of the issues that we have challenges with, your Honor, are the fact that *** the records are very old." Counsel asserted that she "had to beg *** Mr. Greenwalt to appear," and that she "tried to get these records from the Swiss bank

account" and from the "trustees of the blind trust," but they "are not willing to subject themselves to U.S. jurisdiction." Counsel stated that, because the trust was a blind trust,

> "Mr. Fanady lost management control oversight of *** what happened to the funds. He didn't get bank statements. He didn't have control. He didn't feel – He wasn't able to tell the trustees what to do. That was the purpose of the blind trust. That's the purpose of a blind trust for anybody, right? So we can only show you what we can show you."

¶ 72    The court asked,

> "But haven't you made this same argument in front of the Appellate Court and Judge Haracz? I know the setting is a little different this go-around, but *** there hasn't been much new presented today, and this is a repackaging of what's been argued before and you're, in effect, asking me to take Mr. Fanady's word for it that he can't pay any amount.
>
> ***
>
> [Y]ou've explained your limitations in terms of new evidence, but *** other than the Financial Affidavit, I know there's been the passage of time, but what other evidence was introduced today which would warrant me to grant -- ultimately grant the relief that you're requesting?"

¶ 73    Counsel for Fanady responded:

> "We did request from the CBOE for them to again look and refresh their records to see if there was [*sic*] any shares of CBOE stock that were still -- that Mr. Fanady or any of his entities had an interest in, and they do not show anything.
>
> We have records that show that the -- 120,000 shares of CBOE stock were transferred to National Financial Services.

Mr. Fanady has produced a letter that shows that those shares were -- those shares were directed or transferred to Pictet & Cie.

The SF Trust was funded by *** that transfer, the proceeds of that stock sale, and that's how, for years, he subsisted. That paid for the legal bills. That paid for any living expenses.

In 2018, that's when the payments stopped. Mr. Fanady doesn't have resources to pay $10 million and doesn't have 120,000 shares of CBOE stock."

¶ 74 In ruling on Harnack's motion for a directed verdict, the court found that "the witnesses that have been presented have not necessarily done Mr. Fanady any *** favors in terms of what I think his burden will be." The court explained however, that on a motion for a directed finding, "the benefit of the doubt goes to Mr. Fanady." The court stated that it was "going to deny the motion, but I will say it's a very, very close call. But I think it would be appropriate and we would benefit from requiring Ms. Harnack to put on her case. So the motion is denied."

¶ 75 Thereafter, counsel for Harnack called Fanady as an adverse witness. Counsel for Harnack presented Fanady with a copy of an appellate brief Fanady filed in July 2021 in a separate case involving a different ex-wife. In the appellate brief, Fanady had asserted that the evidence in that case showed that "he live[d] on approximately $3,108 per month from the 2009 SF Trust." Fanady agreed that he wrote that in the appellate brief, but testified that it was referring to the evidence "up until 2018."

¶ 76 Counsel for Harnack asked Fanady when he sold the 120,000 shares of CBOE, and he responded that the "dates would have been February 3, 2011, and February 8, 2011." Counsel asked Fanady, "And where is the tax return from 2011?" Fanady responded that he "d[id]n't have to produce a tax return for 2011 for shares that were not produced or sold by me." Fanady denied that he owned the shares when they were in the NFS account, and said, "The trust did."

25

¶ 77    Counsel for Harnack showed Fanady documents that had been produced regarding the trust, and asked whether he was the "income and principal beneficiary of the trust." Fanady responded, "I'd have to say, based on the language, no." Counsel for Harnack asked Fanady to confirm that it was his "position, as we sit here today, that you were not a beneficiary of the trust?" Fanady responded, "Unless the protectors think fit for it, no. *** If they think it is appropriate with their consent, then I am." Fanady testified that he became an "excluded person" from the trust when he "asked for distribution based on the Court's orders and other actions." Fanady stated that he received "letters *** saying 'An event of duress has occurred. We will not comply.' So I'm excluded."

¶ 78    Fanady acknowledged being asked in his deposition about a debit card account into which money from the trust and his prior income had been deposited. Fanady asserted that he had "no statements" from that debit card. He acknowledged that he testified in his deposition that there were account statements online. He stated, however, that it was "impossible" for him to access those online statements while he was being detained. Counsel for Harnack asked if there was anything preventing Fanady from asking his counsel to get those documents on his behalf, and Fanady responded, "No, but I just don't remember the password and the user ID." Counsel for Harnack asked if there were any other accounts for which Fanady did not remember the login credentials, and Fanady testified that there were "no other account statements."

¶ 79    Counsel for Harnack asked if Fanady had any account statements to show the receipt of shares or proceeds from the sale to the Swiss bank account. Fanady responded that he had "no access to any record whatsoever, to the records from the trust, none." Counsel for Harnack asked Fanady what had changed in his circumstances since the prior appeal in terms of his ability to pay. Fanady answered, "The shares simply didn't exist beforehand, they don't exist then, they didn't exist since 2011." Fanady also testified that there was a change because there was "no more funds left in the trust. It's expended." Counsel for Harnack asked how the trust was expended in 2020, if Fanady

maintained that the trust had not paid any of his living expenses since 2018. Fanady stated, "whatever was left over, it appears, that was spent in terms of even maintaining a structure. There are costs associated with yearly maintenance."

¶ 80    Fanady testified that he had never created a corpus list to show what was in the trust, and that he was not "required to create a corpus list in 1995 when [the trust] was first created." Counsel for Harnack asked if he had made one "at any time, including during the myriad of proceedings when you said that the trust [was] totally exhausted." Fanady responded that "[n]o one directed [him] to," that he did not "think [he] had an obligation to," and that he would not be "able to do it after the trust was working properly" because he "would not know what the assets are in it."

¶ 81    Fanady also acknowledged that he was a "manager of GAMMA Investments," and that GAMMA Investments held a bank account with "funds that [Fanady] used to pay [his] living expenses." Fanady agreed that he had not produced any statements for that account, but stated that he "believe[d] GAMMA Investments was shut down in 2016." Fanady acknowledged that he never reported to the IRS "any income derived from that," stating that he was "not required to."

¶ 82    Following Fanady's testimony, both sides rested. Counsel for Fanady argued that Fanady had been detained for 10 months, and that the supreme court's decision in *Betts* provided that there was a "six-month cutoff for indirect civil detention, without a finding of recalcitrance." Counsel for Harnack disputed Fanady's characterization of *Betts,* calling it a "gross misstatement." The court continued the matter to allow the parties to provide written closing arguments.

¶ 83    Following the hearing on Fanady's motion to vacate, the court's ultimate ruling appears to have been delayed by several ongoing issues which required significant court attention. In particular, Fanady moved for his release on electronic monitoring in July 2022, which was denied in December 2022, and he filed a motion to reconsider the trial court's denial of that motion in March of 2023. Fanady's motion to reconsider was denied in an August 10, 2023, written order. Fanady also filed a

federal civil rights action against the Cook County Sheriff on August 9, 2022, and a petition for writ of *habeas corpus* on August 21, 2023.

¶ 84    On February 28, 2023, Fanady also moved for a supervisory order in the supreme court, contending that the trial court had failed to comply with Local Rule 13.8, and requesting that the supreme court order it to do so. Fanady also asserted that he should be immediately released because he had been incarcerated for more than six months, contending that under *Betts*, incarceration for indirect civil contempt could not exceed six months unless there was a finding of "recalcitrance." Fanady's motion for a supervisory order was denied on March 27, 2023.

¶ 85    Additionally, at some point during the proceedings, Jerome Israelov, one of Fanady's former business partners who had been a defendant in the earlier consolidated case, began attending some hearings. At a hearing on April 21, 2023, counsel for Fanady questioned whether Israelov was allowed to be in attendance, and the court asked Israelov why he was there. Israelov responded that he had been "awarded a certain number of shares" earlier in the case, and that the case had been

> "appealed multiple times, and if there is an iota of a possibility that this case could be further appealed and that I might be then forced to relinquish the shares that I was awarded, I believe that I have every right to monitor this case. I'm still a defendant. And until I'm released from that, I don't understand why I should not be able to attend."

¶ 86    The court asked if the parties objected, and counsel for Fanady stated that her understanding was that "his appearance has been struck. So I'm concerned about—I'm just curious about that." Counsel for Harnack stated that he was "not going to take a position on Mr. Israelov's status in the case," but noted that the case was "still an open case. *** The courtroom hasn't been sealed, so I *** don't understand why he would be prohibited from appearing. Other than that, I don't take a

28

position. Ms. Harnack doesn't care either way." Counsel for Fanady clarified that Fanady did "object," but "[o]f course, it's up to you."

¶ 87    The court asked Israelov if his appearance had been struck. Israelov stated that he was previously represented by counsel, and that he was now representing himself. Israelov asked if he needed to "make a request for an appearance to represent myself in a case when I'm *** a defendant?" The court gave Israelov seven days to file an appearance, "unless someone can *** tell me more about an appearance being struck."

¶ 88    Harnack later filed a motion to reconsider the trial court's decision to allow Israelov to file an appearance. Fanady asserted that Israelov was committing "criminal stalking," that Harnack's lawyers were "aiding and abetting Mr. Israelov," and that Israelov was "attempting to use this Court to enable him to continue stalking" Fanady.

¶ 89    On September 6, 2023, the court granted Fanady's motion to reconsider and struck Israelov's appearance. The court explained that the decision was based on Israelov's admission that he had "no further cause of action in this case." The court noted, however, that courtrooms are generally "open to the public" and therefore Israelov would be able to "monitor this case like any other person of the general public." The court explained, however, that it felt "compelled to address" Fanady's accusations that Israelov was committing the offense of criminal stalking, and that Harnack's attorneys were aiding and abetting that crime. The court:

> "strongly admonishe[d] all parties that this forum will not be used to litigate any criminal allegations of stalking. But, in addition, the Court reminds all counsel that the Rules of Professional Conduct require a level of respect and decorum that is, unfortunately, rarely exhibited in this case."

¶ 90    On September 21, 2023, Fanady moved to substitute the trial judge "for cause," contending that Fanady had filed a lawsuit against Israelov, Harnack, and Harnack's attorneys, and that the

judge would be a witness in that lawsuit. Specifically, Fanady alleged that Israelov was "stalking" Fanady "in collusion with" Harnack and her attorneys, and that the trial judge "witnessed many of [the] actions which constitute stalking." Fanady asserted that the judge's involvement in the lawsuit would "cause a reasonable person to question [the judge's] impartiality" and asked that the judge be substituted "for cause." The following day, Fanady also moved to "disqualify" Harnack's attorneys, alleging that they "aide[d], abet[ted] and assist[ed] Mr. Israelov in his stalking of Fanady."

¶ 91    On September 29, 2023, the parties appeared on Fanady's motions. Counsel for Fanady stated that the trial court's

> "involvement as a witness in the stalking lawsuit would cause a reasonable person to question your impartiality in this case, and that's why we filed this Motion for Substitution of Judge for Cause. And so I guess my question to you, your Honor, is: Are you planning to recuse yourself in this case?"

¶ 92    The court responded, "at this juncture, I do not believe it is warranted to voluntarily recuse myself, and therefore, I will decline to recuse myself." The court and parties then discussed that the matter would be transferred to the presiding judge for random reassignment for ruling on the motion to substitute for cause. The court entered and continued the motion to disqualify Harnack's counsel. The court also noted that there was an October 17, 2023, hearing date previously set for "compliance status." In light of the motion to substitute, the court indicated that the date would "stand *** unless there is some indication that it needs to be struck." Counsel for Fanady stated that she wanted to be "mindful" of a "continuing issue with *** [scheduling] compliance statuses moving forward, which would be required every 30 days." The court explained that motions to substitute for cause were "very rarely *** filed in my courtroom" and that, although it was

> "completely [Fanady's] right to file a Motion for Substitution of Judge for Cause, *** it is a practical reality that you all would want me not to touch this matter given

the filing of it. If that results in delay, which being candid, it inevitably will, I'm sure you're all cognizant of that."

¶ 93    Counsel for Fanady replied, "I appreciate that, your Honor. Thank you."

¶ 94    The matter was transferred to another judge, who held a hearing on Fanady's motion for substitution of judge for cause on December 11, 2023. Following the hearing, the judge entered a written order, denying Fanady's motion "for the reasons stated on the record." [1] A copy of the transcript from that hearing does not appear in the record on appeal.

¶ 95    The matter was returned to Judge Forti, who held compliance hearings on January 12, 2024, February 8, 2024, March 1, 2024, and April 3, 2024. During those hearings, the court allowed counsel for Fanady's requests to allow Fanady to speak directly. Fanady generally repeated his arguments regarding the impossibility of performance, that the accounts were "awarded to" Fanady in the judgment, and that records "don't exist anymore." During Fanady's statements at these hearings, Fanady contended, among other things, that the trial judge had "condemned him to death," that the judge's "only *** goal" was to "kill" Fanady, and that the judge was "ignoring the law, [and] violating [Fanady's] rights" due to "bias" against Fanady.

¶ 96    After Fanady's comments at the March hearing, counsel for Harnack asked that the court require "any future status dates be limited strictly to the status of the merits of the case and not anybody's personal feelings about your Honor or the attorneys or the other parties but strictly the matter before the Court."

¶ 97    The court responded:

---

[1] Thereafter, the complaint filed against Harnack and her attorneys in the separate proceedings involving Isrealov's alleged "criminal stalking," were dismissed in February 2024. Another division of this court affirmed that dismissal in March 2025. See *Fanady v. Israelov*, 2025 IL App (1st) 240419-U.

"We're stopping. *** I've given folks ample opportunity to air whatever grievances or concerns they may have. *** I am compelled to say one other thing: *** I happened to be reviewing the original habeas corpus petition that is currently pending in the Northern District of Illinois, and I'm troubled, [counsel], about the assertions made there that *** I've not made any inquiry to you and your client *** during the course of these compliance statuses. It strikes me that I have done that at every single compliance status. So I'm troubled by that."

¶ 98    Counsel for Fanady responded that she "apologize[d] if it offend[ed]" the court, but she did not "know why scheduling compliance statuses *** every 30 days has been such a challenge." Counsel also stated that the compliance statuses that were being conducted did not provide "meaningful inquiry," and "[m]ost of the time, [Fanady is] not even allowed to speak." The court disagreed, noting in particular, that the court had specifically continued the prior status because Fanady could not attend, and the court "wanted to give Mr. Fanady the opportunity to speak." The court explained that

"we can quibble about whether, at the very beginning, there wasn't a compliance status every 30 days, but that's been rectified. But your comments in the habeas [proceeding are] about the substance of it, and *** that is what I take exception to, and I'm glad we have a record which establishes that."

¶ 99    Fanady then interrupted stating that he wanted to "put in the record that in September you threatened my attorney outside" after a court appearance. The court expressed confusion, and Fanady asserted, "you know what you did in September when it was *** just the attorneys and you." The court responded, "[A]t this point we'll conclude this. I appreciate everyone's comments."

¶ 100    At the April 3, 2024, hearing, the court asked counsel for Fanady if there had been any "change in terms of Mr. Fanady's ability or willingness to address the reasons why he's been

incarcerated." Counsel for Fanady responded that it was "not unwillingness," but "inability to comply." Counsel asked if Fanady could "respond directly to [the] question." The court agreed, if the response was "brief, because I don't think anything substantive has changed in the many months that we've *** had these [compliance hearings]."

¶ 101    Fanady protested that it "seems like your mind is already precluded and closed off." The court disagreed, and instructed Fanady, "If you stay on the issue at hand, sir, you are free to speak. But if you go off, and either make false assumptions about the Court's impartiality or anything else, I will then, within my authority, ask you -- or order you to cease."

¶ 102    Fanady asserted that he was "concerned about the tenor and the tone" with which he "was just addressed." The court responded, "The tenor is fine. *** These are becoming problematic *** Mr. Fanady, but please proceed."

¶ 103    Fanady began arguing that "this case is now just an issue of the rule of law and my constitutional rights." Fanady asserted that the accounts he was being ordered to give Harnack were "awarded to [Fanady] in the judgment" and "[t]hey were consumed and closed, now going on for two decades." Fanady stated that there were "no records" and there was "no duty to keep any records." Fanady further stated his belief that he was "just being legally crucified for the sin of defaulting; however, I still have rights. A default was not unlawful. I didn't conceal anything." Fanady asserted that it was Harnack and her attorneys who lied, and "[n]ow, in order to protect Harnack, who is wealthy, privileged, and connected, a decade later I'm in the position of this. I have no rights anymore. She lied. And I still have to somehow comply with the lie and the document."

¶ 104    Fanady argued that the court "wants [him] to prove the impossible. Documents that don't exist from two decades ago and can't be obtained, I have to now produce. Assets that were concealed over the course of two decades and no longer exist, I need to somehow produce. I can't do it."

33

Fanady continued, "what this case also tells me is that no one is safe any longer. There is no rule of law. *** No consequences to the liar."

¶ 105   At this point, the court interrupted, stating "I think we can stop there." Fanady replied, "Oh, okay. This case stinks like a dead skunk."

¶ 106   The court then addressed Fanady's counsel. The court explained that, although an opinion was not yet written, it planned to deny Fanady's motion to purge or vacate the contempt order as "woefully deficient." The court stated that it found Fanady was not credible, that there was a "lack of evidence" supporting Fanady's motion, and that Fanady did not satisfy his burden of proof.

¶ 107   The court then asked, "Rather than waiting for [this court] to issue [the] opinion that is going to ultimately deny Mr. Fanady's request for relief, *** why don't I just memorialize today *** that judgment" and "to the extent that Mr. Fanady believes he will have a better opportunity to plead his case, you can go to the Illinois Appellate Court." The court asked counsel for Fanady, "So what's your take on this, [counsel]? To the extent that your client appears to suggest he cannot get justice, *** you can get relief from the Illinois Appellate Court."

¶ 108   Counsel for Fanady responded, "If you're going to make an oral ruling today, are you going to also address the six-month limit and -- and whether Mr. Fanady has – there's been any finding, an evidentiary finding, of him being recalcitrant?" The court replied that it believed that the "six-month rule does not apply" but that such a question would be "clearly reviewable de novo in the Appellate Court. *** So if I'm incorrect on any of -- all of these things, I believe your *** possible resolution is in the Appellate Court." The court continued, "I believe that we've exhausted things at this point, and I am going to make my ruling based on the comments that I've made in court today with the addition of 304 rulings, and then Mr. Fanady can have his day in the Appellate Court."

¶ 109   That same day, the trial court entered a written order stating, "For the reasons stated in open court and on the record, [Fanady]'s Motion to Purge or Vacate Contempt, filed 07/28/22, is denied.

The court makes the express finding that there is no just reason for delaying the enforcement or appeal or both of this judgment."

¶ 110   Fanady filed a timely notice of appeal under Illinois Supreme Court Rule 304(a) on April 15, 2024.

¶ 111    On June 14, 2024, counsel for Fanady filed a motion to "stay incarceration" or to "release [him] from confinement" in this court. Fanady alleged that he had been being held in the Cook County Jail for indirect civil contempt for two years, and that the trial court was "neglect[ing] [its] mandated obligations" by failing to return him to court every 30 days under Local Court Rule 13.8.

¶ 112   In ruling on that motion, this court noted that Fanady was effectively asking us to rule on the merits of the appeal, when the record on appeal and the briefs had not yet been filed. We explained that, in particular, this court did not yet have a copy of Fanady's motion to purge or vacate the contempt order, nor did we have transcripts from the multi-day hearing. "Without the benefit of the record on appeal, this court d[id] not know what evidence was before the court, or what findings it made during the evidentiary hearing." However, acknowledging the significance of Fanady's two-year incarceration, as well as the fact that commitment for civil contempt may lose its coercive effect, even where it was lawfully entered (see *Sanders*, 163 Ill. 2d at 540-41), this court ordered: "To the extent that the trial court did not make explicit findings as to whether the order of contempt remains coercive, or whether it has become merely punitive, this court remands this matter to the trial court to do so, on or before July 31, 2024."

¶ 113   On July 31, 2024, the trial court entered an order in response, explaining that it had previously "intended to issue a written ruling containing specific findings of fact and conclusions of law," but it instead "issued a brief oral opinion" to allow Fanady an expeditious appeal. The trial court acknowledged that for indirect civil contempt, incarceration "must serve a coercive purpose," but that the "mere passage of time is not a sufficient basis to demonstrate that it no longer has

coercive purpose." The trial court explained that in *Harnack IV*, this court affirmed findings that established that Fanady had the ability to comply with the order, and that incarceration was an appropriate means on compelling compliance. The trial court also noted that the burden of proof to show impossibility was on Fanady, and that he did not satisfy that burden. The trial court expressly found that Fanady's "continued incarceration serves a coercive function and is not punitive."

¶ 114   In Fanady's brief on appeal, he asks this court to reverse the trial court's order denying his motion to purge or vacate the order of indirect civil contempt. Fanady first contends that our supreme court has enacted a "six (6) month limit" on incarceration for indirect civil contempt after which the trial court must enter a new sanction, and that the mere passage of time is sufficient to require an order of indirect civil contempt to be vacated. Fanady next asserts that the evidence shows that he does not have the ability to comply with the order and that his incarceration has become punitive and not coercive. Fanady also asserts that the court orders holding him in custody have "expired, requiring Fanady's immediate release from jail." Finally, Fanady asserts that the trial court "materially failed to comply with Local Rule 13.8(a)(iv) by intentionally refusing to hold hearings on [his] continued incarceration" and that he should be released as a result.

¶ 115   As this court stated in our most recent appeal, " 'Vital to the administration of justice is the inherent power of courts to compel compliance with their orders.' " *Harnack IV*, 2022 IL App (1st) 210143, ¶ 46, quoting *Sanders*, 163 Ill. 2d at 540. Accordingly, a party may be held in civil contempt for willfully failing to comply with a court order. *In re Marriage of Charous,* 368 Ill. App. 3d 99, 107 (2006).

¶ 116   Civil contempt is coercive in nature rather than punitive, and is imposed to compel the contemnor to perform a particular act, not to punish for prior bad acts. See *Betts*, 200 Ill. App. 3d at 44. Incarceration has long been an appropriate sanction for indirect civil contempt, so long as it serves a coercive purpose. *Sanders*, 163 Ill. 2d at 540; *Tirio*, 2019 IL App (2d) 181019, ¶ 73.

However, commitment for civil contempt may lose its coercive effect even when it was lawful when it was originally ordered, and the sanction must be vacated once it becomes clear that it is no longer coercive. *Sanders*, 163 Ill. 2d at 540-41.

¶ 117 Where a contemnor moves to vacate a sanction imposed on a prior order finding him in contempt, "the contemnor bears the burden of demonstrating that the sanction has lost its coercive force and will not likely cause him to comply with the order of the court." *Id.* at 541. A court may consider the credibility of the contemnor's "avowed refusal to comply with the order" in determining whether a sanction for civil contempt remains coercive. *Id.* The court, however, need not "accept a contemnor's declaration as dispositive." *Id.* " 'Obviously, the civil contempt power would be completely eviscerated were a defiant witness able to secure his release merely by boldly asserting that he will never comply with the court's order.' " *Id.*, quoting *In re Grand Jury Investigation,* 600 F.2d 420, 425 (1979).

¶ 118 Our supreme court has set out several criteria that may be considered by the trial court in determining whether a sanction order has lost its preclusive effect. In particular, the court may consider the contemnor's reasons for refusing to comply, the age and health of the contemnor, the length of the incarceration, and the significance of the ends to be achieved by the underlying order. *Sanders*, 163 Ill. 2d at 541-42. A contemnor may also "offer evidence from other inmates, community members, or expert witnesses regarding the strength of his resolve not to comply with the order of the court." *Id.* at 542.

¶ 119 Our supreme court has explained the "unique nature of the finding required" in such circumstances, as the trial court " 'is obliged to look into the future and gauge, not what will happen, but the prospect that something will happen.' " *Id.*, quoting *In re Parrish*, 782 F.2d 325, 327 (1986). "In view of the nature of this finding, and the trial judge's obvious advantage in seeing and hearing the witnesses firsthand, review of the decision is highly deferential." *Sanders*, 163 Ill. 2d at 542.

¶ 120   We first address Fanady's contention that there is a six-month limit on incarceration for indirect civil commitment. Fanady relies on *In re Marriage Betts,* 200 Ill. App. 3d 26, 57 (1990), which he contends provides that when "six months of incarceration ha[ve] expired" the trial court must "vacate the sentence imposed and resentence" the contemnor.

¶ 121   *Betts* has been recognized as "the seminal case that sets forth in detail the differences between direct and indirect contempt and civil and criminal contempt." See *Philizaire v. Robinson*, 2024 IL App (1st) 240206-U, ¶ 14. In *Betts*, 200 Ill. App. 3d at 44, the court explained that civil contempt is imposed for coercive purposes, *i.e.*, to compel the contemnor to perform a particular act. The fundamental attributes of civil contempt are that (1) the contemnor can take the action sought to be coerced and (2) no further sanctions are imposed on the contemnor after his compliance with the pertinent court order. *Id.* In contrast, criminal contempt generally arises from a prohibited act and is designed to punish past conduct instead of coercing compliance. *Id.* at 46.

¶ 122   The court in *Betts* also explained that "fewer constitutionally mandated procedural rights apply to persons charged with civil contempt than apply to those charged with criminal contempt." Id. at 49. Specifically, where a person is charged with criminal contempt and the potential penalty could exceed the parameters normally imposed for a misdemeanor—*i.e.*, six months imprisonment—that person is entitled to a jury trial. A person who is charged with indirect civil contempt, however, does not have a right to a jury trial. The court explained the reasoning as follows:

> "No jail sentence for indirect civil contempt will exceed six months unless the respondent, through his continued recalcitrance, makes it exceed six months. Prior to the expiration of a six-month period of incarceration, an indirect civil contemnor has ample opportunity either to comply with the court order in question or to explain why he or she cannot comply with it. *** Because of the contemnor's unique ability to control the imposition of sanctions in indirect civil contempt cases, the

constitutional guarantee of a jury trial for criminal contempts when the penalty exceeds six months in jail is wholly inapplicable to indirect civil contempt proceedings." *Id.* at 57-58.

¶ 123   It is this passage which Fanady seizes onto in support of his argument that there is a "six (6) month limit on incarceration for indirect civil contempt." Despite Fanady's strained reading, nothing in *Betts* suggests that there is such a limitation. The court in *Betts* was merely commenting on the "unique" nature of indirect civil contempt proceedings, in that the contemnor holds the "keys to his cell." That does not mean, however, that a contemnor will never be held in custody beyond a six-month period; it is only that the contemnor has the opportunity to control the length of the incarceration, and secure his release, by complying with the order. Consistent with *Betts*, Fanady had "ample opportunity either to comply with the court order in question or to explain why he *** cannot comply with it" within the first six months of his incarceration. *Id.* Indeed, he filed a motion to vacate the order or contempt just one month after he was taken into custody, contending that it was impossible for him to comply.

¶ 124   Moreover, it is clear that the supreme court has never interpreted *Betts* as setting a six-month time limit on incarceration for civil contempt. In *Sanders*, decided just four years after *Betts*, the supreme court affirmed a 3 ½ year period of incarceration as a sanction for indirect criminal contempt, finding there was sufficient evidence to support the trial court's conclusion that the sanction "continued to have a coercive effect." *Sanders*, 163 Ill. 2d at 545. In so holding, the supreme court explicitly stated that "courts are reluctant to set precise limits on the length of time a civil contemnor may be obliged to stay in jail." *Id.*, at 544.

¶ 125   We also disagree with Fanady that the above passage in *Betts* requires that the court make a specific "finding of recalcitrance" in order for incarceration on an order of civil contempt to exceed six months. As stated above, it is the contemnor's burden to show that a sanction has lost its coercive

effect. *Sanders*, 163 Ill. 2d at 541.

¶ 126    Fanady next contends that a contemnor may rely on the mere passage of time to support a claim that a civil contempt order has become no longer coercive. Fanady asserts that it is "rather self-evident" that "there is no way for imprisonment for civil contempt, initially coercive, to become punitive other than the passage of time."

¶ 127    In support, Fanady purports to quote from *Felzak v. Hruby*, 226 Ill. 2d 382, 391-92 (2007), that "the passage of sufficient time is itself sufficient to require an order of civil contempt to be vacated." As counsel for Harnack points out, however, neither that quote, nor an analogous proposition, appears in the cited case. In reply, Fanady's counsel acknowledges and apologizes for the improper quotation marks, stating that "an error *** must have happened during editing." Fanady contends however, that the cited case does "stand for the proposition that the passage of sufficient amount of time, even if nothing else occurs, can be the basis for vacating a civil contempt order."

¶ 128    In *Felzak*, the supreme court considered a contempt order that was entered after a father and stepmother failed to comply with an agreed order requiring visitation between the father's daughter and her maternal grandmother. *Id.*, at 386. Years after the agreed order was entered, the grandmother sought to enforce it, contending that she was being denied visitation with the daughter. *Id.* The circuit court agreed, holding the father and stepmother in indirect civil contempt for failing to obey the visitation order. *Id.*, at 388-89. However, by the time the case reached the Illinois Supreme Court, the daughter had reached the age of majority. The supreme court explained that once the daughter turned 18, it became impossible for the father and stepmother to purge the civil contempt imposed by the circuit court, because they could no longer compel the adult daughter to visit her grandmother. *Id.*, at 391. The supreme court vacated the order for civil contempt against the father and stepmother,

40

explaining that such an order must be vacated " 'once it is evident that the sanction imposed is no longer fulfilling its original, coercive function.' " *Id.*, at 392 quoting *Sanders*, 163 Ill. 2d at 541.

¶ 129   We agree with Harnack that nothing in *Felzak* suggests that the passage of time alone is sufficient to support a conclusion that a civil contempt order is no longer coercive. To the contrary, it was not the passage of time in *Felzak* that made the contempt order no longer coercive, it was that there was an intervening event—the daughter reaching her 18th birthday—which made it impossible for the father and stepmother to comply with the order and purge the contempt.

¶ 130   Our supreme court addressed an argument similar to Fanady's in *Sanders,* 163 Ill. 2d 534. In *Sanders*, a father had been previously charged and convicted of child abduction of his two-year-old daughter from her mother. *Id.* at 536. The father was later held in indirect civil contempt for his failure to comply with an order to produce the missing daughter or disclose information on her whereabouts. *Id.* at 538. The circuit court entered an order sentencing the father to jail, and providing for his release if he complied with the order and revealed the missing daughter's location. *Id.* The father later moved to vacate the order of contempt, contending that the contempt sanction was no longer having a coercive effect, and that his continued incarceration was therefore a violation of due process. *Id.* The father's "principal contention" in both the trial court and the supreme court, was that the "length of confinement by itself—at the point relevant here, 3 ½ years—demonstrated that the sanction was not having a coercive effect." *Id.*, at 543. Our supreme court rejected that argument, noting that the passage of time was "one consideration in determining whether a sanction for civil contempt remains coercive," but that "time alone is not necessarily determinative." *Id.*, at 544.

¶ 131   In *Sanders*, the supreme court explained that the trial court "carefully considered the record ***, which included the [father's] earlier explanation for his failure to comply with the court's order, the [father's] demeanor and credibility, and the significance of the underlying order." *Id.* The supreme court reiterated that a "judge's determination of th[e] question [of whether a sanction for

civil contempt remains coercive] is entitled to great deference." *Id.*, at 545. The supreme court "decline[d] to disturb the judge's decision" finding "sufficient evidence from which the circuit judge could find that the sanction continued to have a coercive effect." *Id.*

¶ 132   We similarly conclude here that there was sufficient evidence from which the trial judge could conclude that the contempt sanction remains coercive. In particular, the trial court heard the evidence, including Fanady's testimony, and was able to judge his demeanor and credibility. Based on those observations, the trial court concluded that Fanady's claims of impossibility were not credible, and that decision is entitled to "great deference." *Id.*

¶ 133   Fanady, however, asserts that the record shows that it is impossible for him to purge himself of the contempt order, and, accordingly, that it must be vacated.

¶ 134   As explained above, in the most recent appeal, this court rejected Fanady's argument that the trial court erred in finding him in contempt based on the defense of impossibility. In this appeal, Fanady continues to maintain that it is impossible for him to comply. However, much of Fanady's evidence and arguments on this issue concern matters that this court has already rejected. In particular, Fanady contends that the stock he was ordered to turn over to Harnack was awarded to him in the judgment for dissolution, and that Harnack caused the trial court to enter an inflated judgment against him. These issues have been repeatedly addressed, and we decline to do so again here. Suffice it to say that in *Harnack IV*, we found those arguments insufficient to meet Fanady's burden to establish that complying with the order was impossible, and we reach the same conclusion here. See *City of Mattoon v. Mentzer*, 282 Ill. App. 3d 628, 636–37 (1996) (where the contemnor relied on the same evidence previously rejected in the original contempt proceedings, such evidence would not support a claim that the contempt order should be vacated).

¶ 135   In his brief in this appeal, Fanady contends that he relies on "three (3) points *** to show he cannot comply with the December 11, 2020." He asserts (1) that it is a "fallacy" that he ever received

$10 million from the sale of the stock, and that he really only received $2.9 million; (2) that he provided "properly authenticated business records" from the trustees that his trust had "run out of money"; and (3) that his financial affidavit shows that he has no other assets, and minimal to no income.

¶ 136   First, the $10 million figure does not arise from a misunderstanding that Fanady sold the CBOE shares for that amount. Rather, it came from the fact that Fanady transferred the shares, and that those shares were valued at $10 million at the time the court issued its contempt order. Other than Fanady's own self-serving testimony, there is no evidence in the record that establishes if or when the CBOE stock was sold, and for how much. Even Greenwalt, the witness Fanady called during the evidentiary hearing, testified that he could confirm only that Fanady "transferred" the shares. He made very clear though that he could not tell what happened to those shares after their initial transfer, and he did not have any information that would show that the shares were sold.

¶ 137   Second, Fanady provides no argument or analysis to support his claim that the letters purportedly from the trustees of his trust were "authenticated" in any way, and we reject such an assertion. The business records exception to the general rule prohibiting hearsay is based on the "recognition that businesses are motivated to keep routinely accurate records and that they are unlikely to falsify records kept in the ordinary course of business and upon which they depend." *People v. Virgin*, 302 Ill. App. 3d 438, 450 (1998). Accordingly, a party may seek admission of a writing or record under the business records exception, where "(1) that writing or record was made as a memorandum or record of the event; (2) it was made in the regular course of business; and (3) it was the regular course of the business to make such record at the time of such transaction or within a reasonable time thereafter." *Id.*, at 451. The proponent of such evidence must establish the above foundation "through testimony by someone familiar with the business and its mode of operation." *Id.* Here, however, Fanady did not call any representative of the trust who is familiar with the

43

business and its mode of operations to testify, and accordingly, the letters are not "properly authenticated business records."

¶ 138    Finally, Fanady's reference to his financial affidavit fares no better. Even assuming that Fanady is telling the truth about having no other income or assets, such a proposition would be insignificant when the record suggests that he previously concealed assets valued in excess of $10 million. Other than Fanady's testimony, he provided no evidence regarding what assets were contained in the trust, and how or when those assets were exhausted. Fanady also provided no statements from the debit account into which funds from the trust were deposited, and which he claimed paid his expenses. Without any evidence that would corroborate Fanady's claims, we find no error in the trial court's decision to disregard his financial affidavit.

¶ 139    Fanady next asserts that the court orders holding him in custody have "expired, requiring Fanady's immediate release from jail." Fanady relies on 735 ILCS 5/12-107.5 (West 2024), which provides that

> "(a) No order of body attachment or other civil order for the incarceration or detention of a natural person respondent to answer for a charge of indirect civil contempt shall issue unless the respondent has first had an opportunity, after personal service or abode service of notice as provided in Supreme Court Rule 105, to appear in court to show cause why the respondent should not be held in contempt.
>
> ***
>
> (c) Any order issued pursuant to subsection (a) shall expire one year after the date of issue."

¶ 140    As this court explained in *Harnack IV*, 2022 IL App (1st) 210143, ¶ 72,

> "the statute on which Fanady relies governs body attachment orders that are intended to bring an alleged contemnor before the court, so that the he or she may 'answer for

44

a charge of indirect civil contempt' and so the court may adjudicate whether that person should be held in contempt. This section does not apply after a person has already been given that opportunity, appeared before the court, and been held in contempt."

¶ 141   We noted that in this case, Fanady received notice of the evidentiary hearing and appeared at that hearing where he was provided an opportunity to be heard, and the court found him in indirect civil contempt and committed him to the Cook County jail until he purged that contempt. "Section 12-107.5 of the Code of Civil Procedure simply does not apply under these circumstances." *Id.*; see also *In re Marriage of Shulga*, 2022 IL App (1st) 211018-U, ¶ 84 (finding that "section 12-107.5 of the Code is simply not applicable" where a contemnor "received notice; (2) *** was given the opportunity to show cause why she should not be held in contempt; (3) and *** was adjudicated to be in indirect civil contempt.").

¶ 142   Moreover, even if there was any merit to defendant's contention that the body attachment order "expired," such expiration would have no effect on Fanady's current incarceration. See *In re Marriage of Parrillo*, 2024 IL App (1st) 240143-U, ¶ 32 ("the purpose of the body-attachment orders was to authorize the sheriff to take [the contemnor] into custody to effectuate the orders of commitment as contempt sanctions. *** Once the sheriff had followed the court's command 'to serve this writ and return it without delay,' the obligations imposed by the attachment orders were discharged in full.").

¶ 143   Finally, Fanady asserts that the trial court "materially failed to comply with Local Rule 13.8(a)(iv) by intentionally refusing to hold hearings on [his] continued incarceration" and that he should be released as a result. Fanady contends that under Local Rule 13.8(a)(iv), the trial court was required to conduct "meaningful or substantive hearings on the issues of Fanady's ability to comply" every 30 days, and that the trial court "utterly failed" to do so.

¶ 144   Cook County Local Rule 13.8(a)(iv) provides as follows:

>   "Every order remanding a contemnor to the custody of the Cook County Department
>
>   of Corrections for indirect civil contempt must include a provision that the contemnor
>
>   will be returned to the court for status at periodic intervals, but in no event less
>
>   frequently than every thirty (30) days."

¶ 145   As the plain language indicates, the Rule requires only that orders remanding a contemnor into custody for indirect civil contempt include a provision "that the contemnor *will be returned to the court* for status *** no *** less frequently than every thirty (30) days." (Emphasis added). The Rule does not provide any explicit requirements of what needs to occur at those status hearings, and it does not require that the status hearings be "substantive" or "meaningful," as Fanady contends.

¶ 146   Fanady acknowledges that the trial court conducted 12 compliance statuses in the 22 months that he was in custody prior to the final order at issue in this appeal—on August 24, 2022; September 28, 2022; May 22, 2023; June 28, 2023; July 19, 2023; August 24, 2023; September 6, 2023; October 17, 2023; January 12, 2024; February 8, 2024; March 1, 2024; and April 3, 2024. Fanady's complaints against the trial court primarily relate to two time periods. First, Fanady contends that the trial court failed to conduct the first compliance status until "fifty-seven *** days" after he was taken into custody. He asserts that trial court's later finding that there had not been a violation of the Local Rule during that initial period was "clearly false" and an "attempt by the court to create a false record." Fanady also contends that there was a "seven-month gap" between the September 28, 2022 and May 22, 2023, during which he contends that the trial court did not conduct any compliance status hearings. Fanady's contentions are dispelled by the record.

¶ 147   Defendant was taken into custody on June 28, 2022, and the trial court conducted a status hearing 23 days later, on July 21, 2022. A transcript of that hearing does not appear in the record, and accordingly, we do not know what occurred at that hearing. "[A]n appellant has the burden to

present a sufficiently complete record of the proceedings at trial to support a claim of error," and "[a]ny doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch v. O'Bryant,* 99 Ill. 2d 389, 391–92 (1984). Nevertheless, the record suggests that both Fanady and his counsel appeared at that status hearing. Where Fanady was indeed, "returned to the court for status" within 30 days of his incarceration, we find no violation of Local Rule 13.8(a)(iv).

¶ 148   We also note that the court held a hearing on Fanady's emergency motion to set a compliance status in which he complained that he had not yet been given the required status hearing pursuant to Local Rule 13.8, but a copy of that transcript also does not appear in the record on appeal. Without an adequate record to review Fanady's challenge, we presume that that the trial court acted properly (*Foutch,* 99 Ill. 2d at 391-92), and we will not speculate that the court's finding that there had not been a violation of the rule was an attempt to create a "false record."

¶ 149   We also reject Fanady's contention that the court failed to conduct any status hearings under Local Rule 13.8(a)(iv) during the period between September 28, 2022, and May 22, 2023. The record shows that Fanady personally appeared before the court on at least three occasions during that time—November 30, 2022, January 5, 2023, and April 18, 2023. And even if a "meaningful or substantive hearing" on whether Fanady could comply with the contempt order was required, as Fanady contends, it cannot reasonably be argued that the trial court did not conduct such a hearing on those dates. On two of those dates, January 5, 2023, and April 18, 2023, the trial court held an evidentiary hearing on Fanady's motion to vacate the contempt order, during which Fanady extensively testified. And during the other status date, on November 30, 2022, counsel for Fanady reminded the court that "one of the reasons we're here today" was for Fanady's "compliance status." Counsel for Fanady asked that the court allow Fanady to speak, and the court agreed, asking Fanady directly what he had done "to change the status quo," since the last hearing. In response, Fanady

referenced settlement discussions, but generally contended that it was impossible for him to comply or to make any settlement offer because he had "no money."

¶ 150   In addition to the above dates on which Fanady personally appeared, we note that the record suggests that Fanady appeared before the court through his counsel on at least nine other occasions. Although Fanady was not personally present at those hearings, his counsel could have, and did, bring to the court's attention any relevant issues regarding the status of Fanady's compliance with the contempt order.

¶ 151   Moreover, the record indicates that at least some of the delays between compliance status hearings were attributable to Fanady. In particular, Fanady filed a motion for a supervisory order in the supreme court, which caused the trial court to question whether it had jurisdiction to continue hearing the matter while that motion was resolved. Fanady also filed a lawsuit against Harnack and her attorneys, accusing them of aiding Israelov's alleged "criminal stalking" of Fanady. And Fanady moved to substitute the trial judge "for cause" and to disqualify Harnack's attorneys, based on their involvement in those "criminal stalking" allegations. As the court noted after Fanady filed his motion to substitute the trial judge for cause, it was Fanady's right to file such motions, but it was a "practical reality" that doing so could "result[ ] in delay."

¶ 152   The record also suggests that after the November 30, 2022, compliance hearing, counsel for Fanady did not raise the issue of compliance hearings until January 11, 2023, when counsel informed the clerk, outside the presence of the judge, that "We also need to get compliance statuses back on the calendar for Mr. Fanady. *** We missed the—the December 20th one would have been the next compliance date, and so we would be due one on January 30th." The clerk responded, "All right. Well, I'll see what the judge says when he gets on." Counsel for Fanady then failed to raise the issue with the trial judge during the remainder of the court appearance. The next time counsel asked to schedule a compliance hearing was on April 21, 2023, three days after the conclusion of the

48

evidentiary hearing. Counsel asked the court, "Since, you know, Mr. Fanady is still detained, are we going to be resuming the 30-day compliance statuses?" The court responded, "I think we should. But when *** would that be?" Counsel agreed that the compliance status was due within 30 days "[o]f today." The parties discussed numerous possible dates, with the court and both parties indicating various availability issues. Ultimately, the matter was set by agreement to May 22, 2023, when Fanady acknowledges that a compliance status occurred.

¶ 153    Finally, we note that even if we were to find that the trial court violated Local Rule 13.8(a)(iv) at any point, Fanady has provided no authority to support his contention that a violation of that rule would require his release.

¶ 154    In general, when a court or other governmental official fails to comply with a time frame imposed by statute or Rule, this court looks to the "mandatory" or "directory" distinction to determine whether a consequence flows from such a violation. See *People v. Cooper,* 2025 IL 130946, ¶¶ 29-32; *People v. Ziobro*, 242 Ill. 2d 34, 43 (2011) ("Once a violation [of a timing requirement] has been established, the court must determine the consequence of such violation."). The mandatory-directory distinction indicates whether the failure to comply with a specified procedural step will or will not invalidate a governmental action. *Id.* "The law presumes that statutory language issuing a procedural command to a government official is directory, rather than mandatory, meaning that the failure to comply with a particular procedural step does not invalidate the governmental action to which the procedural requirement relates." *Cooper*, 2025 IL 130946, ¶ 33, citing *Lakewood Nursing & Rehabilitation Center, LLC*, 2019 IL 124019, ¶ 29; see also *People v. Delvillar*, 235 Ill. 2d 507, 514–15 (2009) ("statutes are mandatory if the intent of the legislature dictates a particular consequence for failure to comply with the provision. [citation] In the absence of such intent the statute is directory and no particular consequence flows from noncompliance.").

¶ 155   As noted above, Fanady has provided no authority for his contention that the trial court's alleged violations of Local Rule 13.8 require his release, and he has similarly made no argument to overcome the presumption that the Rule is intended to be directory. Although we conclude that Local Rule 13.8(a)(iv) is directory, rather than mandatory, we note that the Rule must still be complied with, and we are confident that the trial court will do so in the future.[2]

¶ 156   For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 157   Affirmed.

---

[2] Fanady also challenges what he contends is the trial court's continued "disregard" of Local Rule 13.8 during the pendency of this appeal. Fanady asserts that the trial court wrongly believed that it lost jurisdiction over the matter while it was on appeal, and that accordingly, it failed to conduct any hearings under the Rule. This court's jurisdiction was conferred under Illinois Supreme Court Rule 304(a)—governing appeals from final judgments that do not dispose of the entire proceeding where the trial court makes an express written finding that there is no just reason for delaying either enforcement or appeal or both. Rule 304(a), however, does not confer jurisdiction on this court to consider issues that have arisen following the final judgment for which those findings were made, and, accordingly, we lack jurisdiction to consider this challenge.